UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| USCOC OF GREATER MISSOURI, LLC, )<br>)<br>  Plaintiff, )<br>)<br> vs. )<br>)<br>CITY OF FERGUSON, MISSOURI, )<br>)<br>  Defendant. ) | Case No. 4:07-CV-1489 (JCH) |

## MEMORANDUM AND ORDER

The matter is before the Court on Plaintiff USCOC of Greater Missouri, LLC's Second Motion for Partial Summary Judgment (Doc. No. 36), filed March 4, 2008. The matter is fully briefed and ready for a decision.

## BACKGROUND

By way of background, Plaintiff is a wireless telecommunication service provider holding a Federal Communications Commission license to provide wireless telecommunication services within certain market areas. (Pl.'s Statement of Undisputed Material Facts ("Pl.'s Facts"), Doc. No. 37 at ¶ 1). Defendant City of Ferguson is a political subdivision within the state of Missouri. (Id. at ¶ 2).

In 2006, Plaintiff and Fresno Ranch Management Co., Inc. ("Fresno") entered into a lease for a portion of Fresno's parcel of land located at 914 Airport Road, Ferguson, Missouri ("Property"). (Id. at ¶¶ 4, 8). Plaintiff intended to install a 105-foot wireless communication tower ("Tower") on the Property. (Id. at ¶ 8).

The Ferguson, Missouri Zoning Code ("City Code") allows telecommunication towers as a special use, but requires that the builder obtain a special use permit before installing a tower. City Code §§ 23.0, 23.7.[1] The City Code states that when considering a special use permit application:

> 23.4 . . . [I]t shall be the duty of the Commission and the Council to give consideration to the effect of the requested use on the health, safety, morals and general welfare of the residents of the area in the vicinity of the property in question and the residents of the city generally. In considering the special use, the Commission and the Council should consider the following:
>
> 23.41 The compatibility with surrounding uses and compatibility with the surrounding neighborhood.
>
> 23.42 The comparative size, floor area and mass of the proposed structure in relationship to adjacent structures and buildings in the surrounding properties and neighborhood. . . .
>
> 23.47.1 The general appearance of the neighborhood will not be adversely affected by the location of the proposed use on the parcel, nor will the materials used in the construction of the proposed buildings of the special use be greatly dissimilar, or that the general architecture of the building standing out or create a visual problem with the neighborhood. . . .
>
> 23.47.3 The impact of landscaping of the proposed use in terms of maintained landscaped areas versus areas to remain in a natural state, openness of landscape versus the use of buffers and screens.

Id. at §§ 23.4- 23.47.3. Additionally, the City Code requires telecommunication towers to meet additional criteria, such as the following:

> 1. A communication tower shall not exceed 150 feet in height.
>
> 2. The communication tower shall be set back from the property line a minimum of one (1) foot for every foot of structure height. No communication tower shall be located within 200 feet of any residential structure. . . .
>
> 4. Prior to approval of a communication tower by the City Council, the applicant shall document its efforts to locate the proposed antenna on an existing communication tower within the city or in close proximity to the City. Such documentation shall also indicate why co-location on any existing tower is not feasible.

---

[1]See Mot. for Partial Sum. J., Doc. No. 36 at Ex. 2, 12.

>12. Prior to approval of a communication tower by the City Council, the applicant shall document its efforts to locate the communication tower on publicly owned land including but not limited to federal, state, county, municipal, school district, library district, and fire district land.

Id. at § 23.7.

On November 14, 2006, Plaintiff contacted Defendant about filing an application for a special use permit ("SUP Application") to construct the Tower. (Mot. for Partial Sum. J., Doc. No. 36 at Ex. 3). On December 15, 2006, Plaintiff and Defendant met to discuss the Tower. (Id. at Ex. 3 pp. 3-4). At this meeting, Defendant informed Plaintiff of potential problems with its SUP Application. (Id.). Although Plaintiff's proposal violated the setback requirements, Plaintiff informed Defendant on April 4, 2007 that it would seek approval of its SUP Application and then would seek a variance to remedy the setback violations. (Id.). On April 9, 2007, Plaintiff formally filed its SUP Application. (Id. at Ex. 1 p. 1)

On June 20, 2007, Defendant's Planning and Zoning Commission ("Commission") considered the SUP Application and recommended that the Ferguson City Council ("Council") deny it. (Id. at Ex. 5). The Commission concluded that the Tower would not meet the setback requirements listed in City Code §§ 23.7(1)-(2), would not blend in with the one story buildings surrounding it, and would not have any landscaping. (Id. at Ex. 4 pp. 8-9). Additionally, the Commission noted that Plaintiff neither suggested any alternative sites nor explained why other locations would not work. (Id. at p. 8). On July 24, 2007, the Council, after holding a public hearing and considering the Commission's report, voted to deny the SUP Application. (Id. at Ex. 7). The Council provided its reasons for the denial by issuing Resolution 2007-30 that read, in pertinent part:

> ***Whereas***, the location of the telecommunication tower and related equipment facilities is in direct violation of City Ordinance; for instance, the proposed tower does not meet the minimum required setback of two hundred (200) feet from any adjoining

residential structure, nor the minimum setbacks required from the property line for its height and the fence enclosure extends into the front yard setback; and

*Whereas*, under State Law, the City Council has no discretion to approve a proposed plan and application for a special use permit which violates City Ordinance; . . .

*Whereas*, the Planning and Zoning Commission has recommended denial of the application for special use permit; and

*Whereas*, because of the obvious violations of City Ordinance inherent in this application and accompanying plan, the City Council need not address whether the application and accompanying plan meet other ordinance requirements for a special use permit. . . .

The Application for a Special Use Permit for a telecommunication tower and related equipment facilities for 914 April Road is hereby denied for the reason that the plan is in violation of City Ordinances.

(Id. at Ex. 10) (emphasis in original).

On July 19, 2007, Plaintiff filed an application with the Ferguson Board of Adjustment ("Board") for an area variance ("Variance Application"). (Id. at Ex. 7). On February 4, 2008, the Board voted to deny Plaintiff's Variance application. (Id. at ¶ 15). On March 10, 2008, Plaintiff received a written decision ("Board's Decision") from the Board, which in relevant part, states:

> 4. The Applicant seeks an area variance to all four setback requirements between a proposed tower and the property boundaries such that the tower will be 31 feet from the property boundary to the north, 23 feet from the property boundary to the east, 68 feet from the property boundary to the south and 100 feet from the property boundary to the west. The Applicant also seeks a variance to the 200-foot setback requirement between a proposed tower and any residential structure such the tower will be only 118 feet from one nearby residential structure on an adjoining parcel and, possibly, within 200 feet of other nearby residential structures.
>
> 5. There are no unique characteristics of this property which create an unnecessary hardship or practical difficulties to the owner or to the Applicant.
>
> 6. Strict adherence to the requirements of the code will not create an unnecessary hardship or practical difficulties due to the configuration or size of the lot or topography or other land conditions, to wit:
>
>> The property is a 19,000 square foot lot fronting on Airport Road. It meets the minimum lot size required for the C-1 zoning district. The

> property is flat, is of normal shape and has no topographic characteristics or dimensions that are unique from other properties in the C-1 zoning category. The petitioner agrees in their BOA application with the assessment that the property is a "flat asphalt surface" and that there are no unique physical characteristics. The property can easily be utilized for uses which are permitted in the C-1 zoning category. There are no practical difficulties caused by the physical conditions of the land which prevent the use of the property in accordance with the C-1 zoning regulations.
>
> 7. Because of the proximity of the proposed tower to Airport Road, overhead utility lines servicing the area and adjacent residential properties and because of the height of the proposed tower and the extent of the variances requested, the proposed variance will adversely affect adjacent property owners or residents and the public health, safety, order, convenience, and general welfare of the community.
>
> 8. Granting the variance will violate the general spirit and intent of the Zoning Ordinance.

(Resp., Doc. No. 47 at Ex. A).

On August 27, 2007, Plaintiff filed this suit alleging that Defendant's denial of its SUP Application and Variance Application violated the Federal Telecommunications Act of 1996 ("TCA"), the United States Constitution, and Missouri Law. (Compl., Doc. No. 1). Plaintiff amended its Complaint on March 7, 2008. (Am. Compl., Doc. No. 41). The Amended Complaint alleges the following counts: (I) violation of the TCA, 47 U.S.C. § 332(c)(7)(B)(iii); (II) violation of the TCA, 47 U.S.C § 332(c)(7)(B)(i)(I); (III) violation of the TCA, 47 U.S.C. § 332(c)(7)(B)(i)(II); (IV): substantive due process; (V) procedural due process; (VI) equal protection; (VII) inverse condemnation and takings; (VIII) violation of 42 U.S.C. § 1983; and (IX) violation of Missouri state law.[2] (Am. Compl. at pp. 4-14). On September 21, 2007, Plaintiff filed its motion for summary judgment on Count I of the Complaint. (Mot. for Partial Sum. J., Doc. No. 5). On November 29, 2007, the Court denied Plaintiff's first motion for summary judgment. (Doc. No. 31). On March 4,

---

[2] Claims IV-VII allege violations of both the Missouri Constitution and the United States Constitution.

2008, Plaintiff filed its Second Motion for Partial Summary Judgment on Count I asserting that the Board failure to issue its written opinion within thirty days of denying the Variance Application at the February 4, 2008 meeting violated the TCA. (Memo. in Supp., Doc. No. 38). On March 17, 2008, Defendant filed a motion to dismiss alleging that Counts IV-IX must be dismissed. (Doc. No. 42).

**DISCUSSION**

**I.    Motion to Dismiss**

   **A.    Standard of Review**

In ruling on a motion to dismiss, the Court must view the allegations in the Complaint in the light most favorable to Plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Additionally, the Court must accept "the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." Coons v. Mineta, 410 F.3d 1036, 1039 (8th Cir. 2005). A motion to dismiss must be granted if the Complaint does not contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. ---, 127 S. Ct. 1955, 1974 (2007) (abrogating the "no set of facts" standard for Fed. R. Civ. P. 12(b)(6) found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Stated differently, to survive a motion to dismiss, the Complaint's factual allegations "must be enough to raise a right to relief above the speculative level." Id. at 1965.

   **B.    TCA Claims (Counts I-III)**

Defendant asserts that Counts I-III, which allege violations of the TCA, are unripe because Plaintiff has not exhausted its state judicial remedies. (Doc. No. 42). Plaintiff responds that it is not required to exhaust its state judicial remedies under the TCA.

It is well-established that the existence of a case or controversy is a prerequisite for the exercise of federal judicial power under Article III. One important element of this requirement is

satisfying the ripeness doctrine, which determines when a party may go to court. See Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n. 18 (1993) (this doctrine derives both from Article III and prudential reasons). Essentially, ripeness is a question of timing. See Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 140 (1974). The doctrine's basic rationale is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs v. Gardner, 387 U.S. 136, 148-49 (1967). In the context of land use decisions, zoning authorities must be given the opportunity to "arrive[] at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." Sprint Spectrum L.P. v. City of Carmel, 361 F.3d 998, 1002 (7th Cir. 2004)(quoting Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 191 (1985)).

The TCA allows a party that has been "adversely affected by any final action or failure to act" of a local government to commence a suit against it within thirty days of the "final action or failure to act." Id. at § 332(c)(7)(B)(v). Thus, under the TCA, an action is ripe once a "final action" has occurred. The Eighth Circuit has not ruled on this issue. The term "final action" is not defined in the TCA, but the legislative history states "[t]he term 'final action' . . . means final administrative action at the State or local government level so that a party can commence action under the subparagraph rather than waiting for the exhaustion of any independent State court remedy otherwise required." H.R. Conf. Rep. 104-458, at 209 (1996). Based on this legislative history, courts have concluded that a plaintiff is not required to exhaust his state judicial remedies before filing a TCA claim. See City of Carmel, 361 F.3d at 1001 n. 2, 1004 (holding that exhaustion of judicial remedies not required to constitute a "final action"); SPRINTCOM, Inc. v. Puerto Rico Regulations & Permits Admin., 490

F. Supp. 2d 238, 242-43 (D. P.R. 2007) (same); Omnipoint Holdings, Inc. v. City of Cranston, C.A. No. 06-531-ML, 2007 WL 2050316, at *2 (D.R.I. July 12, 2007) (same); USCOC v. Town of Bow, No. 05-cv-327-PB, 2007 WL 655471, at *3 (D.N.H. Feb. 26, 2007) (same); AT & T Wireless PCS, Inc. v. Town of Porter, 203 F. Supp. 2d 985, 989 (N.D. Ind. 2002) (same). The Sixth Circuit implied that exhaustion of state judicial remedies is not required under the TCA when it held that an agency decision constituted a "final action." Telespectrum, Inc. v. Pub. Serv. Comm'n of Ky., 227 F.3d 414, 422-23 (6th Cir. 2000).

Upon consideration, the Court finds that the TCA does not require the exhaustion of state judicial remedies for an action to be considered "final." Courts unanimously agree that this is the correct interpretation, USCOC, 2007 WL 655471, at *3, and Defendant has not cited any precedent on point that reaches the opposite conclusion. The rules of statutory construction also require this result. When interpreting statutory law, a federal court's objective "is to give effect to the intent of Congress," United States v. McAllister, 225 F.3d 982, 986 (8th Cir. 2000), and to interpret the statute "as a symmetrical and coherent regulatory scheme" in order to "fit, if possible, all parts into an harmonious whole." Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000). Here, it would make little sense to require telecommunication providers to proceed through the entire state administrative and judicial process. Such a requirement is contrary to the TCA's "expedited review" provision, 47 U.S.C. § 332(c)(7)(B)(v), as well as its goal of reducing "the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers." City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115 (2005). As such, the Court finds that Counts I-III are ripe for review because Plaintiff was not required to exhaust its state judicial remedies.

  **C. Constitutional Claims (Counts IV-VIII)**

Defendant asserts that Counts IV-VIII must be dismissed because they are either unripe or fail to state a claim. Plaintiff seemingly concedes that these claims might be unripe. As an initial matter, the Court notes that Plaintiff alleges his Fourteenth Amendment due process and equal protection claims as independent claims. A plaintiff, however, cannot assert claims directly under the Fourteenth Amendment. See, e.g., Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989). Rather, they have to be asserted under 42 U.S.C. § 1983. Id. Because Plaintiff has alleged a § 1983 cause of action in Count VIII, the Court will interpret Count IV-VI as being brought under § 1983.

In order for a takings claim to be ripe, a landowner must have sought compensation from the state through the available state procedures. Williamson County Reg'l Planning Comm'n, 473 U.S. at 194-95; see San Remo Hotel v. City & County of San Francisco, 545 U.S. 323, 342-43 (2005) (holding that landowner must follow Williamson's exhaustion requirement, even if it precludes review by a federal court). The Missouri Constitution allows for actions to recover compensation for any takings by the government. See Mo. Const. art. I, § 26. Additionally, Missouri allows a party to file an action for inverse condemnation against the government when its property has been taken without the "formal exercise of the power of eminent domain." Mo. Real Estate & Ins. Agency, Inc. v. St. Louis County, 959 S.W.2d 847, 849 (Mo. Ct. App. 1997).

The Eighth Circuit has held that a procedural due process claim is unripe unless plaintiff has exhausted its state judicial remedies. See Wax'N Works v. City of St. Paul, 213 F.3d 1016, 1019-20 (8th Cir. 2000). Similarly, the Seventh Circuit extended Williamson to include substantive due process claims that are related to land use disputes. Forseth v. Village of Sussex, 199 F.3d 363, 368-371 (7th Cir. 2000). The Seventh Circuit explained that "[l]abels do not matter. A person contending a state or local regulation of the use of land has gone overboard must repair to state court." River Park, Inc. v. City of Highland Park, 23 F.3d 164, 167 (7th Cir. 1994). As such, the ripeness requirements

applies with "full force to due process claims (both procedural and substantive) when based on the same facts as a takings claims." Greenfield Mills v. Macklin, 361 F.3d 961-62 (7th Cir. 2004); Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88-89 (2d Cir. 2002) (applying ripeness requirement to due process and equal protection claims). A substantive due process claim that alleges a public use claim, however, is exempt from the Williamson ripeness requirement. See Rumber v. Dist. of Columbia, 487 F.3d 941, 945 (D.C. Cir. 2007) (noting that the circuits all agree on this exception).

Courts have extended Williamson's ripeness requirement to cover equal protection claims raised in land use disputes. See; Rumber, 487 F.3d at 945 (D.C. Cir. 2007); Patel v. City of Chicago, 383 F.3d 569, 573 (7th Cir. 2004); County View Estates @ Ridge LLC v. Town of Brookhaven, 452 F. Supp. 2d 142, 149 (S.D.N.Y. 2006); Goldfine v. Kelly, 80 F. Supp. 2d 153, 159 (S.D.N.Y. 2000). A plaintiff can avoid this requirement if his claim "can be made independently from a takings claim." Patel, 383 F.3d at 573. Such an independent claim occurs in the land use context, if absent an allegations related to a fundamental right or a suspect class, the plaintiff alleges "governmental action wholly impossible to relate to legitimate governmental objectives." Forseth, 199 F.3d at 370-71. This standard is satisfied when the equal protection claim is based on (1) the malicious conduct of a governmental agent or (2) circumstances, such as a prayer for equitable relief, that would evaporate if the governmental body treated everyone equally and "sufficiently suggests that the plaintiff has not raised just a single takings claim with different disguises." Id.

Upon consideration, Counts IV-VII are unripe. Plaintiff admits that it has not filed a cause of action in the state court for compensation, meaning its takings claim is unripe. (Resp., Doc. No. 43 at p. 3). Additionally, it admits that it has not filed a writ of certiorari in the circuit court, which is the procedure in Missouri for reviewing the decision of a board of adjustment. Mo. Rev. Stat. §

89.110. This failure to file means that Plaintiff's equal protection claim and due process claims are unripe. The Court also finds that the pleadings do not suggest that Plaintiff's substantive due process and equal protection claims are of the type that are exempted from <u>Williamson</u>'s ripeness requirement. Finally, the Court must dismiss Plaintiff's § 1983 claim because it has dismissed all the underlying constitutional claims. As such, Claims IV-VIII are dismissed.

### D. State Law Claim (Count IX)

Defendant asserts Count IX fails to state a claim because its allegations that Defendant violated a state law are impermissibly vague and do not set out what state laws were violated. (Doc. No. 42 at p. 7). Plaintiff responds that Defendant violated Mo. Const. art. V, § 22 and Mo. Rev. Stat. § 536.140. (Doc. No. 43 at p. 5).

Upon consideration, Count IX fails to state a claim. While Plaintiff cites specific Missouri laws in its Response, it did not do so in its pleadings. The failure to identify what state law Defendant violated, as well as the failure to make anything more than vague allegations, means that Plaintiff has not alleged enough facts to state a claim for relief that is plausible on its face. <u>See</u> <u>Twombly</u>, 127 S. Ct. at 1965. As such, this claim will be dismissed, but Plaintiff will be given an opportunity to amend its complaint.

## II. Summary Judgment

### A. Standard of Review

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The substantive

law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

**B.** **Count I**

Plaintiff contends that the Variance Application's denial violated the TCA's "in writing" requirement. It also alleges that the remedy for this denial is an injunction ordering the Board to grant the variance. Finally, it alleges the SUP Application is not supported by "substantial evidence" because the lack of a variance was the only reason for its denial. Defendant contends that its denial of the Variance Application is "in writing" and that the SUP Application's denial is supported by substantial evidence.

Congress enacted the TCA in order "to foster competition among telecommunication providers, to improve the quality of their services, and to encourage the rollout of technologies

without delay." USCOC of Greater Iowa, Inc. v. Zoning Bd. of Adjustment of Des Moines, 465 F.3d 817, 820 (8th Cir. 2006). Congress intended the TCA as "a deliberate compromise between two competing aims-to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." Town of Amherst v. Omnipoint Communications Enters., 173 F.3d 9, 13 (1st Cir. 1999). One method that Congress employed to accomplish these goals was the "reduction of the impediments imposed by local governments upon the installation of facilities for wireless communication, such as antenna towers." City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115 (2005). Subject to some limitations, Congress preserved the authority of local governments "over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A).

The TCA requires that any decision denying permission to construct a tower "shall be in writing and supported by substantial evidence contained in the written record." Id. at § 332(c)(7)(B)(iii). A decision is in writing if it is (1) separate from the written record; (2) describes the reasons for the denial; and (3) contains a sufficient explanation of the reasons for the denial to allow a reviewing court to evaluate the evidence in the record that supports those reasons. MetroPCS, Inc. v. City & County of San Francisco, 400 F.3d 715, 721-23 (9th Cir. 2005) New Par v. City of Saginaw, 301 F.3d 390, 395 (6th Cir. 2002) (applying this standard); Southwestern Bell Mobile Sys., Inc. v. Todd, 244 F.3d 51, 59-60 (1st Cir. 2001) (creating this standard); Sprint Spectrum, L.P. v. County of St. Charles, No. 4:06-cv-95 (JCH), Doc. No 34 at pp. 8-9 (adopting this standard); USOC of Greater Iowa, Inc. v. City of Bellevue, 279 F. Supp. 2d 1080, 1084-85 (D. Neb. 2003) (applying this standard). It also allows a party that has been "adversely affected by any final action or failure to act" of a local government to commence a suit against the local government within

thirty days of the "final action or failure to act." Id. at § 332(c)(7)(B)(v). The Court must "hear and decide such action on an expedited basis." Id.

Here, the parties dispute the meaning of the "in writing" requirement and the requirement that a suit against a local authority must be commenced within thirty days of a "final action." Id. at § 332(c)(7)(B)(iii), (v). Plaintiff contends that when read together, these two provisions require that a written decision be issued within thirty days of an application's oral denial. (Memo. in Supp., Doc. No. 38 at pp. 6-7). If Plaintiff is correct, then Defendant violated the TCA because it did not issue a written opinion within thirty days of its initial denial of the Variance Application. Defendant asserts that a "final action" does not occur until the written decision is issued, meaning a plaintiff has thirty days after receiving the written decision to file an action. (Def.'s Memo. in Supp, Doc. No. 47 at pp. 13-14). Ultimately, this dispute hinges on the meaning of "final action."

Courts have come to two different conclusions on this issue. This Court previously reasoned that the TCA requires a written decision to issue within thirty days of an application's oral denial. See Sprint Spectrum, L.P. v. County of St. Charles, No. 4:06-cv-95 (JCH), Doc. No 34 at pp. 8-9. In Sprint Spectrum, this Court, assuming that "final action" meant an oral denial by a local authority, reasoned:

> The time within which a municipality must issue its written decision raises an additional issue under the TCA. When read together, § 332(c)(7)(B)(iii) and § 332(c)(7)(B)(v) require denials to be made in writing within thirty days of a final decision. See also Food & Drug Admin., 529 U.S. 120 at 132-33; Erlenbaugh, 409 U.S. at 244. Otherwise an incongruity arises wherein a wireless provider must file suit in thirty days, but the municipality is not required to inform the wireless provider why its request to build a tower was denied. This situation fails to foster a "symmetrical and coherent regulatory scheme." Food & Drug Admin., 529 U.S. 120 at 132-33.
>
> Additionally, permitting a municipality to render its written decision more than thirty days after taking final action is problematic for four reasons. First, it precludes the plaintiff from attempting to remedy the concerns of the zoning authority without resort to litigation. See Sprint Spectrum L.P. v. County of Saint Charles, No. 4:04CV1144RWS, 2005 WL 1661496, at *4 (E.D. Mo. July 6, 2005) (unpublished

opinion) (holding a written decision sent sixty-five days after the denial cannot be treated as "in writing" for purposes of the Act). Second, delayed findings create reliability concerns about the explanations contained therein. See Va. Metronet, Inc. v. Bd. of Supervisors, 984 F. Supp. 966, 973 (E.D. Va. 1998) (issuance of findings thirty four days after denial and six days after commencement of litigation "strongly suggests that [the findings are] pretextual."). These concerns not only prevent the Court from "expeditiously addressing the case" but also impair the Courts' ability to "accurately analyze the existence and validity of substantial evidence."Sprint Spectrum, 2005 WL 1661496. at *4-5; see also Va. Metronet, 984 F. Supp. at 973 (findings issued after commencement of litigation suggest an intent to prevent the Court from engaging in meaningful substantive review). Third, the evasion of expeditious substantive review is contrary to Congress' intent to have a "pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment" of wireless services Indep. Wireless One Corp., 242 F. Supp. 2d at 414 and to "hear and decide such action on an expedited basis." 47 U.S.C. § 332(c)(7)(B)(v). Finally, it improperly allows the municipality to avoid its statutory duty to issue written findings because the municipality can wait and see if the telecommunication provider will even file suit; thus, the municipality has to fulfill its statutory obligations only when its decisions are challenged. This scenario is not what Congress envisioned when it created the TCA.

Id. Two other district courts have applied similar rationales. See Sprint Spectrum L.P. v. County of Saint Charles, No. 4:04-CV-1144 (RWS), 2005 WL 1661496, at *4 (E.D. Mo. July 6, 2005); Va. Metronet, Inc. v. Bd. of Supervisors, 984 F. Supp. 966, 973 (E.D. Va. 1998).

Conversely, The Eleventh Circuit has held that a final action does not occur until the local government issues its written decision. Preferred Sites, LLC v. Troup County, 296 F.3d 1210, 1217 (11th Cir. 2002). It reasoned that under the TCA, a local authority's "task under the statute is not complete" until it issues its written decision. Id. Because the written decision is the last step a local authority is required to take, it is logically the final action. Id. It also reasoned that this interpretation is more consistent with "traditional appellate procedure." Id. The Sixth Circuit came to a similar conclusion because it could "imagine no other document that would be easier to work with or more useful or informative to an applicant or to a reviewing court than the resolution which embodies the reasons for denial." Omnipoint Holdings, Inc. v. City of Southfield, 355 F.3d 601, 607 (6th Cir. 2004); see Laurence Wolf Capital Mgmt. Trust v. City of Ferndale, 176 F. Supp. 2d 725, 727 (E.D.

Mich. 2000) (holding there is not final action until written decision issues); Indus. Communications & Elecs., Inc. v. Town of Falmouth, No. 98-397-P-H, 1999 WL 33117159, at * 3 (D. Me. June 10, 1999). Other courts have suggested that requiring local governments to issue contemporaneous written findings, which Plaintiff's purposed interpretation would do, would create an "administrative morass" which "might well . . . invite Tenth Amendment scrutiny." See AT&T Wireless PCS, Inc. v. Town of Porter, 203 F. Supp. 2d 985, 993 n. 7 (N.D. Ind. 2002) (quoting AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment, 172 F.3d 307, 313 (4th Cir. 1999)).

Upon consideration, the Court will adopt the Eleventh Circuit's definition of "final action." This interpretation is a more coherent reading of the TCA than the one previously espoused in Sprint Spectrum. Finding that the written opinion is the "final action" better promotes the purposes of the TCA because it means that courts will be presented with a final decision of the municipality setting out its reasons for the application's denial. Otherwise, a situation arises where the local government must rush to issue a written decision within thirty days of voting on the application in order to prevent a court from ordering it to allow the tower. See New Par v. City of Saginaw, 301 F.3d 390, 395 (6th Cir. 2002) (collecting cases holding that an injunction is proper remedy for TCA violation). This administrative nightmare violates the TCA's intent of providing judicial review of local government decisions without usurping zoning control from the local governments. Town of Amherst, 173 F.3d at 13. Finally, failing to wait for a written decision to issue prevents the reviewing court from having the opportunity to review the most useful document in the record. Omnipoint Holdings, Inc., 355 F.3d at 607.

Similarly, the Court believes that the Eleventh Circuit's definition avoids many of the problems discussed in Sprint Spectrum. By not having to file suit until a written decision issues, there is little risk of a local government concocting reasons after the fact. Evasion of expeditious

substantive review is not an issue because a telecommunication provide may still file suit if there is a "failure to act" by the local government. In sum, the Court finds that a "final action" occurs only when the local government has issued a written finding.

The Court must now determine whether the Board's Decision satisfies the TCA's "in writing" requirement. Upon consideration, the Court finds that it satisfies this requirement because it is separate from the record, describes the reasons for denying the Variance Application, and sufficiently explains the reasons for the denial so that this Court can review it. As such, the Court will not issue an injunction ordering the Board to grant the Variance Application. Plaintiff also alleges that the SUP Application was not supported by substantial evidence because the lack of a variance was the sole reason for the SUP Application's denial. Because the Court has found that the Variance Application's denial did not violated the TCA, it also finds that the lack of a variance is a proper reason under the "substantial evidence" standard for denying the SUP Application. As such, the Court will deny Plaintiff's Motion for Partial Summary Judgment.[3]

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (Doc. No. 42) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. No. 37) is **DENIED**.

**IT IS FURTHER ORDERED** that Counts IV-VIII are **DISMISSED** without prejudice.

---

[3]The parties did not address the issue of whether the Board's Decision was supported by substantial evidence. As such, the Court cannot grant Defendant summary judgment on this count. (Am. Compl., Doc. No. 41 at p. 3).

**IT IS HEREBY ORDERED** that Count IX is **DISMISSED,** but Plaintiff may file an amended complaint to correct the deficiencies in this count no later than **Tuesday, June 3, 2008**.

Dated this 14th day of May, 2008.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE